# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON , <br><br> Respondent, <br><br> v. <br><br> TYLOR SEAN DONNELLY, <br><br> Appellant. | DIVISION ONE <br><br> No. 77816-1-I <br><br> UNPUBLISHED OPINION <br><br> FILED: May 6, 2019 |

DWYER, J. — Following a plea of guilty to assault in the third degree, Tylor Donnelly was sentenced to serve two months on a work crew assignment, in addition to one month of community service. His failure to appear for work crew resulted in his termination from San Juan County's work crew program. He appeals from the trial court's denial of his motion to amend the warrant of commitment to award him credit for days during which he was unable to report for work crew. Donnelly's absence from work crew was due to his own mistake in failing to address an issue of which he had notice. As he does not meet the requirements to merit application of the equitable doctrine of credit for time spent at liberty, we affirm.

I

Tylor Donnelly is a Canadian citizen and resident who lives with his family

in Chilliwack, British Columbia. While visiting San Juan County in 2016, Donnelly criminally assaulted and seriously injured David Boyle. Donnelly was charged with assault in the third degree, a class C felony, with the aggravating factor of the infliction of substantial pain.

Pending trial, Donnelly was allowed to return to Canada. He traveled into the United States by automobile to attend court hearings. Donnelly would present his court paperwork to United States Customs and Border Protection personnel each time he crossed the international boundary. In these interactions, Donnelly did not experience any impediments to his desire to cross the border.

Donnelly engaged in plea bargaining negotiations with the San Juan County prosecuting attorney, seeking a sentencing option of minimal inconvenience to himself. The agreement eventually reached by the parties provided for Donnelly to serve his sentence through the San Juan County Sheriff's work crew program during the fall of 2017. Pursuant to this agreement, Donnelly pled guilty to the charge of assault in the third degree. In his statement on plea of guilty, executed April 28, 2017, Donnelly acknowledged that:

> If I am not a citizen of the United States, a plea of guilty to an offense punishable as a crime under state law is grounds for deportation, *exclusion from admission to the United States*, or denial of naturalization pursuant to the laws of the United States.

(Emphasis added.)

The superior court accepted the sentence recommendation agreed upon by the parties and, that same day, imposed a three-month sentence on Donnelly. One month of that sentence was to be served through community service, while

- 2 -

two months were to be served on work crew. Donnelly was ordered to begin the work crew service no later than October 10, 2017. He reported to work crew on October 3 after arranging a house rental in the county for the duration of the work crew portion of his sentence. This was more than five months after the entry of his guilty plea.

Donnelly also reviewed and executed documents in which he agreed to abide by the terms of the work crew program. These documents memorialized Donnelly's "custody status" while in the program and imposed restrictions on Donnelly's freedom of movement, including the requirement that he stay at his designated residence when not at work. His work crew agreement stated:

> [I] WILL ARRIVE AT THE WORK SITE OR DESIGNATED PICK UP POINT AT THE SCHEDULED TIME. . . .
>
> I AGREE TO ABIDE BY ALL THESE RULES WITH THE UNDERSTANDING THAT IF I VIOLATE ANY OF THESE TERMS, I MAY BE RETURNED TO JAIL TO SERVE MY SENTENCE.

Donnelly also agreed that:

> I understand that I must strictly adhere to the schedule programmed for me. I further understand that I must receive permission, in advance, to change anything about my schedule for any reason and that I may be required to provide written proof of any emergency I claim. . . . I further understand that I must remain at my residence during all unscheduled periods. . . .
>
> I agree to travel directly to and from each scheduled point including work and that I may not stop for any reason while in-route unless I have obtained prior permission to do so.

To monitor his compliance with these restrictions, Donnelly was required to wear an electronic monitoring device on his ankle at all times during his commitment. He also consented to random searches of his person, vehicle, or

residence. The documents also made clear the potential consequences of failure to comply with the program's rules, including a charge of escape, a charge of probation violation, or the imposition of jail time for the remainder of his sentence. On these documents, Donnelly designated his rented house in Friday Harbor, San Juan County, as his place of residence.

Not long after he began serving his sentence, Donnelly's supervisor, corrections officer Dan Seaton, presented him with the opportunity to return home on weekends to visit his family. Although Donnelly had not inquired as to this possibility, other work crew members were being allowed to return home on weekends at their supervisor's discretion. Donnelly asserts that Seaton told him that allowing Donnelly to travel to Canada would be no different. Neither Seaton, nor members of the San Juan County Sheriff's Office, nor Donnelly, were aware of restrictions that affected Donnelly's ability to cross the international border.

Donnelly traveled into and returned from Canada twice while in the program. During his visits into Canada, Donnelly continued to wear his ankle monitor. On Monday, October 23, when attempting to enter the United States after his third visit home, Donnelly was denied entry. Although he had previously been allowed across the border, on this occasion he was informed that a prosecuting attorney would have to apply for and obtain a parole permit to allow Donnelly to enter the United States. Donnelly returned to his Canadian residence, where he telephoned the San Juan County Sheriff's Office to report the difficulty. He was told to retain his monitoring bracelet and to continue to abide by house arrest rules while the issue was resolved.

Nine days later, the sheriff informed Donnelly that he had been terminated from the work crew program and that his failure to report on October 24 had the effect of tolling his sentence. Donnelly continued to wear his ankle monitor and abide by house arrest rules until November 3.

Meanwhile, San Juan County Deputy Prosecutor Teresa Barnett contacted a United States Customs and Border Protection official and learned that law enforcement officials had the ability to apply for a parole permit to allow Donnelly to re-enter the United States. Barnett learned, furthermore, that *only* law enforcement personnel were authorized to apply for this permit. She successfully requested that the sheriff's office apply for such a permit for Donnelly. On November 14, the Department of Homeland Security approved the application, permitting Donnelly to enter the United States on December 5 to finish his sentence.

This timing was undesirable for Donnelly due to interference with his holiday plans and his job responsibilities. On November 27, he moved the superior court to amend the warrant of commitment and award him credit for time served while he was unable to enter the United States. In a December 1 hearing on this motion, Donnelly's attorney argued that his sentence had not tolled until his "release" by the sheriff from work crew, and that, because this "release" was made without legal authority, he continued to serve the rest of his sentence while at liberty in Canada. In a decision letter issued on December 4, the trial court granted the motion in part and denied it in part. Donnelly was awarded credit for time served up to the day of his "release" from the work crew program. He did

not receive credit for the remaining period during which he was at liberty in Canada. Donnelly appeals from this decision.[1]

II

Donnelly's appeal relies on the assumption that the San Juan County Sheriff's office had a duty to apply for a parole permit to benefit Donnelly and that the sheriff's failure to do so amounted to negligence. This is so, he avers, because only law enforcement agencies are allowed to apply for this type of permit—indeed, only law enforcement officials may possess the application materials for a parole permit. The State counters that no such duty existed at the time Donnelly began serving his sentence. The State has the better argument.

"To show actionable negligence, a plaintiff must establish (1) the existence of a duty owed to the complaining party, (2) a breach of that duty, (3) a resulting injury, and (4) that the claimed breach was the proximate cause of the injury. Duty in a negligence action is a threshold question. A duty may be predicated 'on violation of statute or of common law principles of negligence.'" Jackson v. City of Seattle, 158 Wn. App. 647, 651-52, 244 P.3d 425 (2010) (citation omitted) (quoting Burg v. Shannon & Wilson, Inc., 110 Wn. App. 798, 804, 43 P.3d 526 (2002)).

The United States Attorney General has the authority to parole a person into the United States temporarily "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Parole is "an extraordinary measure"

---

[1] His sentence has been stayed pending resolution of the appeal.

and is "sparingly utilized." 9 U.S. DEP'T OF STATE, FOREIGN AFFAIRS MANUAL § 202.3-2(A)(b) (rev. Sept. 2018). Requests for parole for an alien outside of the United States for a "significant public benefit" must be made by a U.S. government agency, such as the Department of Justice. 9 F.A.M. 202.3-3(B)(1)(c)(4). In cases involving "an alien whose presence is necessary in connection with legal cases or investigations," including at the state and local level, a local law enforcement agency makes the request "through Department of Justice channels." 9 F.A.M. 202.3-3(B)(2)(c).

Federal immigration law is clear that the local law enforcement agency must be the applicant for a parole permit, and that the defendant or convicted person cannot make the application. See 9 F.A.M. 202.3-3(B)(2). Donnelly was, in fact, not allowed to possess the paperwork required to prepare an application.

Yet these restrictions did not and do not, in themselves, create an affirmative duty on the part of law enforcement to apply for and obtain a parole permit. Notably, Donnelly has not cited any binding or persuasive authority, either in statutes or in our case law, indicating that such a duty exists. "Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none." DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

Nor has Donnelly shown that such a duty would have existed, even had the sheriff's office known of the situation. The sheriff would have had an enforceable obligation to apply for a parole permit only if the superior court had

- 7 -

ordered the sheriff to do so. Donnelly could have requested that the superior court issue such an order in the five-month period between the superior court's imposition of his sentence and the day he began serving the sentence. He did not.

Moreover, the superior court discharged its duty to provide Donnelly notice of potential immigration issues due to his alien status in the statement on plea of guilty, which he signed after consultation with his lawyer and which plea was accepted by the court upon Donnelly's request. Indeed, Donnelly specifically acknowledged that his guilty plea was a ground for exclusion from the United States. He executed his statement on plea of guilty on April 28, 2017 and was not required to begin his sentence until October 10, 2017. Thus, he had over five months to inform himself of, or consult with his attorney regarding, any restriction on his ability to enter the United States, and to facilitate the resolution of any difficulties that were identified.

Donnelly notes that, in theory, without a parole permit, he should not have been able to enter the country to begin serving his sentence in the first instance.[2] However, this observation is of no moment, as regarding the obligation of the sheriff. Donnelly had an affirmative duty to ensure that he would be able to report for work crew. The agreements executed by Donnelly before his sentence began memorialized this responsibility. Neither the prosecutor nor the sheriff had

---

[2] Donnelly also avers that, in the absence of a duty, the sheriff could have refused to apply for a parole permit when asked, leaving Donnelly in a perpetual limbo. This argument ignores the authority of the superior court, resort to which would be available in such circumstance. Furthermore, the speed with which San Juan County law enforcement acted, once alerted to the need for a permit, renders spurious the likelihood of this counterfactual scenario.

the responsibility to study Donnelly's life circumstances and resolve any foreseeable immigration difficulties. The duty was Donnelly's, and Donnelly's alone, to ensure that he would be able to appear as required at the work crew facility to serve his sentence.

Because Donnelly has established no duty on the part of the sheriff, he necessarily fails to establish negligence. See Burg, 110 Wn. App. at 804.

III

In addition to alleging the sheriff's negligence in not, unprompted, researching the need for and applying for a parole permit, Donnelly also avers that his termination from work crew on November 1 was an illegal release made without authority of law. In response, the State does not contend that the sheriff had authority to release Donnelly. Rather, its position is that the trial court correctly concluded that this termination was not a release. We agree.

In its ruling on Donnelly's motion, the trial court stated:

> When the Defendant called the Sheriff on the day he was denied entry, he was instructed to continue complying with the requirements of the work crew program and he did so until the Sheriff told him, about nine days later (November 1st), that he was being "released." The Court views that communication as being intended to notify the Defendant that, as of that date, he was being terminated from the work crew program due to having violated its requirements. The Court is not persuaded that that communication constituted a "negligent release" by the Sheriff, as the Defendant argues. A participant in a work crew program who fails to report for work as scheduled can be terminated from the program. If that participant calls the Sheriff several days after failing to appear as scheduled and is told that they have been terminated, that person is not released from custody, nor relieved of their obligation to serve the full sentence imposed upon them. The Sheriff's use of the word "released" in this case does not alter that fact.

Donnelly argues that the use of the term "release" carries the implication

that the sheriff told Donnelly that his sentence had been completed. This was not the nature of the November 1 communication with Donnelly. Rather, the sheriff's employee stated that Donnelly had ceased serving his sentence due to his failure to comply with the work crew program requirements that he had acknowledged and agreed to.

The sheriff's action was consistent with RCW 9.94A.731(2), which states:

> An offender in a county jail ordered to serve all or part of a term of less than one year in . . . work crew . . . who violates the rules of . . . work crew . . . may be transferred to the appropriate county detention facility without further court order.

Nothing suggests any belief, on the part of the sheriff, that he had the authority to unilaterally relieve Donnelly of the obligation to serve his sentence or the intent to do so. It is not reasonable to conclude that the communication with Donnelly served this purpose. To the contrary, the sheriff did have the authority to terminate Donnelly for failing to appear as required. Donnelly acknowledged this authority when he executed his work crew agreement. Further, as stated above, it was Donnelly's duty to ensure that he would be able to appear, and he knew that failure to do so was not only grounds for termination but also for a potential charge of escape pursuant to RCW 9A.76.110(1). The trial court correctly ruled that Donnelly was terminated from the program. The trial court also correctly ruled that Donnelly was not released from his obligation to serve the sentence imposed on him by the superior court.

IV

The crux of Donnelly's request is that he be awarded credit for time served

at liberty during the balance of his work crew sentence, due to the alleged negligence of (and his allegedly unauthorized release by) the sheriff. However, for the reasons discussed above, Donnelly does not meet the requirements to be granted this equitable remedy. Thus, the trial court was correct in denying, in part, the motion to amend the warrant of commitment.

RCW 9.94A.171(1) provides that:

A term of confinement ordered in a sentence pursuant to this chapter shall be tolled by any period of time during which the offender has absented himself or herself from confinement without the prior approval of the entity in whose custody the offender has been placed.

Donnelly relies on In re Pers. Restraint of Roach, 150 Wn.2d 29, 74 P.3d 134 (2003), in which our Supreme Court adopted the equitable remedy of credit for time served at liberty and set forth the conditions under which such relief may be granted. In Roach, an inmate was released from custody 18 months before the completion of his sentence due to a Department of Corrections error. 150 Wn.2d at 31. The released person then lived in Indiana for nearly three years before being arrested and extradited to Washington to serve the remainder of his sentence. Roach, 150 Wn.2d at 31-32. Under the circumstances, the Supreme Court held that equitable considerations demanded that the person be given credit for the time he had spent at liberty. Roach, 150 Wn.2d at 37-38.

After determining that no Washington statute to the contrary accounted for the situation before it, the court enumerated the following conditions that an applicant must meet to be afforded this remedy:

We, therefore, hold that a convicted person is entitled to credit against his sentence for time spent erroneously at liberty due to the

State's negligence, provided that the convicted person has *not contributed to his release*, has *not absconded legal obligations while at liberty*, and has had *no further criminal convictions*.

Roach, 150 Wn.2d at 37 (emphasis added).

Donnelly also cites to State v. Dalseg, 132 Wn. App. 854, 134 P.3d 261 (2006), in support of his claim. Therein, two defendants, Dalseg and Cestnik, were sentenced in Mason County to serve 12 months in a work release program. Because Mason County had no such program, they were referred to the Nisqually Tribe's program. Dalseg, 132 Wn. App. at 857-58. After the two men had served more than 11 months of their respective sentences in this program, the Mason County prosecutor learned of the program's noncompliance with the relevant statute governing work release programs and asked the trial court to enforce the judgment and sentence. Dalseg, 132 Wn. App. at 859. The trial court denied the men credit for time served and ordered them to serve their sentence as originally imposed. The Court of Appeals reversed, holding that the men were entitled to equitable relief. Dalseg, 132 Wn. App. at 865.

Contrary to Donnelly's assertions, the decisions in Roach and Dalseg do not mandate that he receive the relief he requests. As discussed above, Donnelly's predicament was not the result of negligence by the State. To the contrary, he executed a guilty plea statement in which he acknowledged that he understood the possibility that his conviction could render him excludable from the United States. Nevertheless, he exercised no diligence in discerning whether he would be able to enter the United States, when necessary to do so to comply with the requirements of his sentence. He also acknowledged that he had the

duty of reporting to work crew. It was his failure to do so that caused his termination from the program.

In addition, unlike in Roach, herein a contrary statute does apply. RCW 9.94A.171(1), quoted above, provides for the tolling of a sentence when a work crew member absents himself without prior approval. The Roach court held that this statute could not be applied in Roach's situation because Roach did not absent himself without prior approval: he was released by authorities acting on their own accord. 150 Wn.2d at 36. Similarly, in Dalseg, the defendants had no input on the specific work release program into which they were placed, being instead subject to the State's referral to the Nisqually Tribe's program. 132 Wn. App. at 858. Here, the sheriff's act of allowing Donnelly—at his option—to return home for the weekend was not a release. It was simply a courtesy of a type routinely extended to other participants in the program. It was plainly not an authorization to never return.

As discussed above, Donnelly's termination from the work crew program was also not a release. This is in stark contrast with Roach, in which the prison guards literally opened the door for Roach to leave without any further obligation. 150 Wn.2d at 31. In contrast, Donnelly was terminated when, while serving his sentence on an intermittent schedule, he failed to return after a weekend break. At no time was Donnelly told that he was free from the obligation to serve his sentence. Donnelly's absence, and any prejudice that he asserts he may suffer

as a result, resulted from his own lack of diligence.[3]

Affirmed.

_____
Dwyer, J.

We concur:

_____
Verellen, J.

_____
Appelwick, C.J.

---

[3] In large part, Donnelly argues from the premise that he remained in the custody and control of the sheriff's office while in Canada due to the use of his ankle monitor. The record, however, does not reflect that the sheriff had any control over Donnelly while Donnelly was in a foreign country. It goes without saying that the San Juan County Sheriff could not have simply travelled to Chilliwack, arrested Donnelly, and returned him to Friday Harbor.